# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ESTELLE WEBER, individually, on behalf of the Bear Stearns Companies Inc. Employee Stock Ownership Plan, and all others similarly situated,<br><br>　　　　　　　Plaintiff,<br><br>　　　v.<br><br>THE BEAR STEARNS COMPANIES, INC., CUSTODIAL TRUST COMPANY, JAMES CAYNE, ALAN SCHWARTZ, WARREN SPECTOR, SAMUEL MOLINARO, ALAN GREENBERG, and JOHN DOES 1 - 20,<br><br>　　　　　　　Defendants. | **08 CV 2870**<br><br>Civil Action No: |



## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Doc. 160173

## TABLE OF CONTENTS

I.    NATURE OF ACTION .............................................. 1

II.   JURISDICTION AND VENUE ...................................... 3

III   THE PARTIES .................................................... 3

      A.    Bear Stearns and Custodial Trust Company ...................... 3
      B.    Individual Defendants ........................................ 4
      C.    John Does 1-20 .............................................. 7

IV.   THE BEAR STEARNS EMPLOYEE STOCK OWNERSHIP PLAN ......... 7

V.    DEFENDANTS' FIDUCIARY STATUS .............................. 8

VI.   DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA ................. 9

VII.  FACTS BEARING ON FIDUCIARY DUTY .......................... 12

      A.    Bear Stearns Stock Was an Imprudent Investment for the
          Plan during the Class Period Because of the Company's Serious
          Mismanagement, Precipitous Decline in the Price of its Stock,
          and Dire Financial Condition ................................ 12

VIII. DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES ............. 19

      A.    Defendants' Knowledge of Bear Stearns's Stock Risk and Subsequent
          Communication with Plan Participants and Beneficiaries ........... 19
      B.    Conflicts of Interest ........................................ 21
      C.    Causation .................................................. 22
      D.    Remedies for Defendants' Breach of Fiduciary Duties ............. 22

IX.   CLASS ACTION ALLEGATIONS .................................. 23

X.    CLAIMS FOR RELIEF ........................................... 26

XI.   PRAYER FOR RELIEF .......................................... 34

Plaintiff, individually and on behalf of all others similarly situated, by her attorneys, alleges the following based upon the investigation of her counsel, except as to allegations specifically pertaining to Plaintiff which are based on personal knowledge. The investigation of counsel is predicated upon, among other things, a review of public filings by The Bear Stearns Companies, Inc. ("Bear Stearns" or the "Company") with the United States Department of Labor and the Securities and Exchange Commission, press releases issued by the Company, media reports about the Company, and publicly available trading data relating to the price of Bear Stearns's securities.

## I.    NATURE OF THE ACTION

1.    This Action seeks relief on behalf of the Bear Stearns Companies Inc. Employee Stock Ownership Plan ("Bear Stearns ESOP" or "Plan") and all participants in or beneficiaries of the Bear Stearns ESOP from the time period December 14, 2006, to the present.

2.    Plaintiff's claims arise from the failure of the Defendants to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence, in administering the Plan and the Plan's assets.

3.    Plaintiff alleges that Defendants allowed the imprudent investment of the Plan's assets in Bear Stearns common stock throughout the Class Period despite the fact that they clearly knew or should have known that such investment was unduly risky and imprudent due to the Company's serious mismanagement and improper business practices including, among other practices: (a) causing Bear Stearns to spend billions of dollars purchasing subprime loans despite increasing delinquency rates among subprime borrowers; (b) failing to adequately disclose Bear Stearns's subprime loan loss exposure to investors, including the Plan's participants; (c)

Doc. 160173

operating without the requisite internal controls to determine appropriate loan loss provisions; (d) understating loan loss provisions that did not properly reflect the risk facing Bear Stearns; and (e) subjecting the company to billions of dollars in liabilities from civil and criminal lawsuits, all of which caused Bear Stearns's financial statements to be misleading and which artificially inflated the value of shares of Bear Stearns stock. In short, during the Class Period, the Company was seriously mismanaged and faced dire financial crisis due to such mismanagement, which rendered Company stock an imprudent investment.

4.      As Bear Stearns's dire financial conditions became known to the market, its stock fell from $159.96, on December 14, 2006, to $4.81, at the close of the market on March 17, 2008 – a 97% decline in share price.

5.      Plaintiff's claims arise from the failure of the Defendants to exercise the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" in administering the Plan and the Plan's assets during the Class Period.

6.      In particular, Plaintiff alleges that Defendants breached their fiduciary duties because they knew or should have known that the Company's securities were no longer a prudent investment, yet they failed to take steps to eliminate or reduce the amount of Company stock in the Plans, and failed to give Plaintiff and the Class complete and accurate information about Bear Stearns's loan loss exposure.

7.      As a result of the Defendants' breaches alleged herein, the Bear Stearns ESOP suffered substantial losses.

## II.    JURISDICTION AND VENUE

8.      This action arises under Sections 404, 405, 406, 408, 409, and 502 of ERISA, 29 U.S.C §§ 1104, 1105, 1106, 1108, 1109, and 1132.  This Court has subject matter jurisdiction over this class action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

9.      Many of the pertinent meetings and acts committed by Defendants that give rise to this Complaint occurred in this District.  Venue is properly laid in this District under 29 U.S.C. § 1332(e)(2) because many of the breaches of duty alleged herein were committed in this District and, under § 1391(b), the causes of action asserted in this complaint arose in this District.

## III.    THE PARTIES

**Plaintiff**

10.      Plaintiff Estelle Weber ("Plaintiff") is a participant or beneficiary of the Bear Stearns ESOP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1102(7) and 1132(a), and was a participant or beneficiary of the plan throughout the Class Period.  She continues to own shares of Company stock through the Plan.

**Defendants**

### A.    Bear Stearns and Custodial Trust Company

11.      Defendant Bear Stearns is a financial services firm serving governments, corporations, institutions and individuals worldwide.  The Company's core business lines include institutional equities, fixed income, investment banking, global clearing services, asset management, and private client services.  Headquartered in New York City, the Company has approximately 14,000 employees worldwide.

12.      Bear Stearns is the sponsor of the Plans within the meaning of ERISA, and itself

Doc. 160173

exercised important fiduciary duties and responsibilities. Bear Stearns exercised ultimate decision-making authority for the administration and management of the Plan and Plan's assets and is named as the Plan's administrator according to the Plan's Form 5500 for the year ended December 31, 2005. Thus, Bear Stearns is a fiduciary of the Plans within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21), in that it exercises discretionary authority or discretionary control respecting management of the Plan, exercises authority or control respecting management or disposition of the Plan's assets, and/or exercises discretionary authority or discretionary responsibility in the administration of the Plan.

13.     Custodial Trust Company ("Custodial Trust") is an FDIC-insured commercial bank located in Princeton, New Jersey and a wholly-owned subsidiary of Bear Stearns. Custodial Trust is the trustee of the Plan, according to the Plan's Form 5500 for the year ended December 31, 2005, and acted as a fiduciary in that capacity in that it exercised authority or control with regard to the management or disposition of plan assets of the ESOP.

**B.     Individual Defendants**

14.     Defendant James Cayne ("Cayne") is Bear Stearns' Chairman of the Board and has been since June 2001. Cayne is also a Bear Stearns director and has been since 1985. Cayne was Bear Stearns' Chief Executive Officer ("CEO") from July 1993 to January 2008; a member of the Executive Committee from at least 2007 to January 2008; and President from at least 1991 to June 2001. Because of his positions, Defendant Cayne knew, and/or consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. Defendant Cayne sold 46,415 shares of Bear Stearns stock for $7,645,478 in proceeds while in possession of material non-public

information during the Class Period.

15.     Defendant Alan Schwartz ("Schwartz") is Bear Stearns' current CEO and has been since January 2008. Schwartz is also Bear Stearns' President and a member of the Executive Committee and has been since June 2001 and a director and has been since 1999. Schwartz was Bear Stearns' Co-Chief Operating Officer ("COO") from June 2001 to January 2008; a director from 1987 to 1996; and Executive Vice President and Head of the Investment Banking Division from 1985 to June 2001. Because of his positions, Defendant Schwartz knew, and/or consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. Defendant Schwartz sold 23,333 shares of Bear Stearns stock for $3,823,221 in proceeds while in possession of material non-public information during the Class Period.

16.     Defendant Warren Spector ("Spector") was Bear Stearns' Senior Managing Director from August 2007 to December 2007. Spector was also Bear Stearns' President and Co-COO and a member of the Executive Committee from June 2001 to August 2007; a Bear Stearns director from 1999 to August 2007; an Executive Vice President from November 1992 to June 2001; and a director from 1987 to 1996. Because of his positions, defendant Spector knew, and/or consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. Defendant Spector sold 116,255 shares of Bear Stearns stock for $19,066,373 in proceeds while in possession of material non-public information during the Class Period.

17.     Defendant Samuel Molinaro ("Molinaro") is Bear Stearns' Chief Operating Officer ("COO") and has been since August 2007. Molinaro is also Bear Stearns' Executive

Vice President and has been since December 2001, and Chief Financial Officer ("CFO") and has been since 1996. Because of his positions, Defendant Molinaro knew, and/or consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. Defendant Molinaro sold 10,826 shares of Bear Stearns stock for $1,762,937 in proceeds while in possession of material non-public information during the Class Period.

18.    Defendant Alan Greenberg ("Greenberg") is a Bear Stearns director and has been since 1985. Greenberg is also Chairman of Bear Stearns' Executive Committee and has been since at least 1997. Greenberg was Bear Stearns' Chairman of the Board of Directors from at least 1991 to June 2001 and CEO from 1985 to July 1993. Because of his positions, Defendant Greenberg knew, and/or consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of Bear Stearns. Defendant Greenberg sold 157,982 shares of Bear Stearns stock for $25,755,957 in proceeds while in possession of material non-public information during the Class Period.

19.    The Defendants described in paragraphs 14 - 18 are collectively referred to herein as the "Individual Defendants."

20.    Upon information and belief, the Individual Defendants have ultimate oversight over the Plan, and are fiduciaries of the Plan within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or exercised discretionary authority or discretionary responsibility in the administration of the Plan.

21.    The Individual Defendants had intimate knowledge of the Company's business operations and practices and, therefore, knew or should have known the Company's stock was an imprudent investment during the Class Period.

### C.    John Does 1-20

22.    Defendants John Does 1-20 are reserved for additional fiduciaries of the Plan. At the present time, certain fiduciaries are unknown to Plaintiff, including those fiduciaries appointed by the Defendants to administer the Plan. Once their identities are discovered, Plaintiff will amend her Complaint to join them under their true names.

### IV.    THE BEAR STEARNS EMPLOYEE STOCK OWNERSHIP PLAN

23.    Upon information and belief, the Bear Stearns ESOP purports to be a stock bonus plan intended to be qualified under Internal Revenue Code ("Code") Sections 401(a) and 4975(e)(7), and the Trust holding the assets was intended to be exempt from taxation under Code Section 501(a). Upon information and belief, at all relevant times the Bear Stearns ESOP purported to be an ESOP within the meaning of ERISA 407(d)(6), 29 U.S.C. § 1107(d)(6), in that it was "an individual account plan ... which is designed to invest primarily in qualifying employer securities."

24.    ESOPs are attractive to publicly traded companies such as Bear Stearns for a variety of reasons. An ESOP cuts the cost of raising capital because the company is able to take a federal income tax deduction for principal payments on the loan as well as interest. Dividends are also tax deductible on ESOP stock when they are passed through to participants.

25.    Although the Bear Stearns ESOP was purportedly designed to invest exclusively in Company Stock, a plan document's provision for exclusive investment in company stock is controlling only to the extent that it is consistent with ERISA. As explained below, during the period from December 14, 2006 to the present, Bear Stearns stock was of such a speculative and highly risky nature so as not to be an appropriate exclusive investment for the ESOP, and the change in Bear Stearns's stability, which was dramatic and led it to the brink of bankruptcy, required a rigorous re-examination of Bear Stearns stock as a prudent investment for the ESOP, which comprised a substantial percentage of Bear Stearn's employees' retirement savings.

## V.    DEFENDANTS' FIDUCIARY STATUS

26.    **Named Fiduciaries**. ERISA requires every plan to provide for one or more named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person named as "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a definition, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

27.    **De Facto Fiduciaries**. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, i.e., perform fiduciary functions (including a juridical person such as Bear Stearns). ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), makes a person a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or . . . has any discretionary authority or discretionary responsibility in the administration of such plan."

28.    Upon information and belief, during the Class Period, all of the Defendants acted

as named fiduciaries and/or de facto fiduciaries of the Bear Stearns ESOP.

## VI.    DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

29.    ERISA is a comprehensive statute covering virtually all aspects of employee

benefit plans, including retirement savings plans, such as the Plan.  The goal of ERISA is to

protect the interests of Plan participants and their beneficiaries:

> It is hereby declared to be the policy of this chapter to protect
> interstate commerce and the interests of participants in employee
> benefit plans and their beneficiaries, by requiring the disclosure and
> reporting to participants and beneficiaries of financial and other
> information with respect thereto, by establishing standards of
> conduct, responsibility, and obligation for fiduciaries of employee
> benefit plans, and by providing for appropriate remedies, sanctions,
> and ready access to the Federal courts.

ERISA § 2(b), 29 U.S.C. § 1001(b).

30.    Under ERISA, those responsible for employee benefit plan management stand in a

fiduciary relationship to plan participants.  Pursuant to ERISA, a "fiduciary" is defined broadly to

include all persons or entities that are able to exercise discretionary authority over the

management of a plan or the payment of benefits.  29 U.S.C. § 1002(21)(A).  ERISA requires

strict fidelity and loyalty in the execution of the plan's management.

31.    ERISA imposes on Defendants, who are responsible for the Plan, the requirement

to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and

their beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances

then prevailing that a prudent man acting in a like capacity and familiar with such matters would

use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1)(B),

29 U.S.C. § 1104(a)(1)(B).

32.    ERISA also imposes on Defendants responsible for the Plans a duty of loyalty, requiring these Defendants to "discharge [their] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . for the exclusive purpose of ... providing benefits to the participants and their beneficiaries." ERISA § 404 (a)(1),(A),(i), 29 U.S.C. § 1104(a)(1),(A),(i).

33.    Other duties imposed upon Defendants who are fiduciaries under ERISA by virtue of their exercise of authority or control respecting the management of the Plan or disposition of Plan assets, include but are not limited to:

a.    The duty to investigate and evaluate the merits of decisions affecting the use and disposition of plan assets;

b.    The duty to evaluate all investment decisions with "an eye single" to the interests of plan participants and beneficiaries;

c.    The duty to avoid placing themselves in a position where their acts as officers, directors, or employees of the Company will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan, and, if they find themselves in such a position, to seek independent, unconflicted advice;

d.    The duty, under appropriate circumstances, to monitor or influence the management of the companies in which the plan owns stock including, where appropriate, the obligation to bring a derivative action if the fiduciaries were or should have been aware that the officers and directors

of the entities whose stock was held by the plan had breached fiduciary duties owed their shareholders;

e.  To the extent that a party is responsible for appointing and removing fiduciaries, the duty to monitor those persons who have been named; and

f.  The duty to disclose and inform of any material adverse information about the company which duty entails, among other things: (1) a duty not to make materially false and misleading statements or misinform plan participants; (2) an affirmative duty to inform plan participants about material adverse factors which were affecting the company any time the fiduciary knew or should have known, pursuant to his duty to investigate, that failing to make such a disclosure might be harmful; (3) a duty to convey complete and accurate information material to the circumstances of plan participants and their beneficiaries; and (4) a duty to insure that investments were not purchased at a price above what the Defendants, but not the participants and beneficiaries, knew or should have known to be in excess of fair market value as defined in the relevant Treasury regulations and in most instances at a price which renders it improbable that the investments will bring a fair return commensurate with the prevailing rates.

34.  ERISA permits the fiduciary function to be shared among various individuals and entities. Given ERISA's functional conception of a fiduciary, absent formal discovery it is impossible to know which fiduciaries exercised which fiduciary functions. Based on the

information available to Plaintiff, the Defendants' fiduciary responsibilities were at least partially

allocated among Bear Stearns, Custodial Trust Company, and the Individual Defendants.

## VII.    FACTS BEARING ON FIDUCIARY DUTY

### A.    Bear Stearns Stock Was an Imprudent Investment for the Plan during the Class Period Because of the Company's Serious Mismanagement, Precipitous Decline in the Price of its Stock, and Dire Financial Condition.

35.    At a time when the rise in foreclosures and delinquency rates were dramatically

increasing[1], Bear Stearns was investing heavily in subprime loans. The loans, which targeted low

income borrowers, and saddled them with high interest rates, were heavily criticized as

predatory. Bear Stearns was one of the largest facilitators of subprime loan originations. Bear

Stearns did this by "securitizing" sub-prime loans for clients (direct originators), in that they

would create an entity, sell subprime mortgages to the entity, and sell interests in the entity to

third party investors, essentially repackaging the mortgages into saleable securities. Bear Stearns

also created collateralized debt obligations ("CDOs"), which are "structured products" that hold a

basket of assets, which, many of the times, included the securities created from securitized

subprime loans. During the Class Period, Bear Stearns used complex structured finance

transactions to conceal the true value of its subprime related securities, and sold the securities to

unsuspecting investors.

36.    Towards the end of 2006, the value of subprime mortgages began to plummet, as

did the CDOs that contained subprime mortgages. Despite these material adverse circumstances,

---

[1]According to the FDIC, total subprime delinquencies rose from 10.33% in the fourth quarter of 2004 to 13.33% in the fourth quarter of 2006 and foreclosures rose from 1.47% to 2.0% over the same period. *See* Sandra L. Thompson, Dir., Div. Of Supervision and Consumer Prot., *Testimony Before the Committee on Mortgage Market Turmoil: Causes and Consequences,* Mar. 22, 2007, *available at* http://www.fdic.gov/news/news/speeches/chairman/spmar22071.html.

Defendants directed Bear Stearns to issue a series of false and misleading statements that

downplayed an impending collapse of Bear Stearns, and misled investors and Plan participants

regarding the financial condition of Bear Stearns and its subprime exposure.

37.    On December 14, 2006, Bear Stearns reported its full year 2006 financial results.

The press release issued in connection with the announcement stated in part:

> "We are pleased to announce Bear Stearns' fifth consecutive year of
> record net income and earnings per share," said James E. Cayne,
> chairman and chief executive officer. "Our continued success is a
> testament to our unwavering focus on serving our clients with
> excellence; attracting and retaining talented professionals and
> profitably expanding our broad and diverse franchise. I look forward
> to 2007 and our continued expansion both internationally and
> domestically."
>
> ***
>
> Fixed income net revenues were $1.1 billion, up 25% from $839
> million in the fourth quarter of 2005. The credit business produced
> record results led by the credit derivatives, distressed debt and
> leveraged finance areas. Mortgage revenues increased reflecting
> higher volumes and increased commercial-mortgage securitization
> activity.

38.    On March 15, 2007, Bear Stearns announced its first quarter 2007 financial results

and issued a press release that stated in part:

> "We are pleased with this excellent performance, revenues for the
> first quarter were up for every business segment," said James E.
> Cayne, chairman and chief executive officer of The Bear Stearns
> Companies Inc. "Growing the company remains a core focus as we
> continue to invest in the clearing, mortgage, international and asset
> management franchises with successful results."
>
> ***
>
> Fixed Income net revenues were $1.1 billion, up 27% from $907
> million in the year-ago quarter. The credit business produced record

> results led by the credit derivatives and distressed debt areas. The
> interest rate area also produced strong results reflecting increased
> volatility and higher customer volume. Residential mortgage-related
> revenues decreased from the prior year period, reflecting weakness in
> the U.S. residential mortgage-backed securities market.

39.     On June 12, 2007, the media reported that a large hedge fund controlled by Bear

Stearns had fallen 23% from the start of the year through late April. "The fund, called the

High-Grade Structured Credit Strategies Enhanced Leverage Fund, [was] widely exposed to

subprime mortgages, or home loans to borrowers with weak credit histories." Kate Kelly and

Serena Ng, *Bear Stearns Fund Hurt by Subprime Loans*, Wall St. J., June 12, 2007.

40.     Before the market opened, on June 20, 2007, the media reported that two Bear

Stearns hedge funds that held more than $20 billion of investments, mostly in complex securities

made up of bonds backed by subprime mortgages were close to being shut down as a rescue plan

fell apart in a drama that could have wide-ranging consequences for Wall Street and investors.

Kate Kelly, Serena Ng and David Reilly, *Two Big Funds At Bear Stearns Face Shutdown --- As

Rescue Plan Falters Amid Subprime Woes, Merrill Asserts Claims*, Wall St. J., June 20, 2007.

On this news, the Company's common stock tumbled from its close of $146.79 on June 19, 2007

to close at $139.10 on June 25, 2007 – a 5.2% decline in less than a week.

41.     On July 17, 2007, Bear Stearns sent a letter to investors in its two troubled hedge

funds, notifying them that the hedge funds were nearly worthless and that it would wind them

down. According to media reports, the hedge funds had equity value of $638 million in the more

highly levered fund and $925 million in the less levered fund as recently as March 2007.

42.    On August 2, 2007, it was publicly reported that investors in the hedge funds brought claims against Bear Stearns for misleading them about the extent of the investment bank's exposure to risky mortgage-backed securities.

43.    On August 3, 2007, S&P issued a negative outlook on the long-term direction of Bear Stearns' credit ratings. The bond rating firm cited Bear Stearns' high degree of reliance on the U.S. mortgage sector as one of the drivers behind its decision to downgrade the outlook. On this news, Bear Stearns stock dropped 6.2%, from a $115.62 close on August 2, 2007 to a close of $108.35 on August 3, 2007.

44.    On August 3, 2007, in a conference call with investors that Bear Stearns held in response to S&P's downgrade, Defendant Samuel Molinaro false and misleadingly stated in part:

> With respect to liquidity, our balance sheet, capital base and liquidity profile remained strong. We have significantly reduced our reliance on unsecured commercial paper and increased our usage of various secured funding sources. We maintain an alternative liquidity plan that should allow us to satisfy maturing short-term debt obligations over the next 12 months without needing to access the unsecured credit markets.

45.    On the same August 3, 2007 conference call, one analyst asked "Okay, very lastly, in the asset management business with respect to any reputational fallout from the two hedge funds, have you been seeing redemptions across other funds that we should think about?" Defendant Sameul Molinaro false and misleadingly responded:

> Obviously, we've seen redemptions in the other asset-backed securities fund we have. I'm sure there will be redemptions across several of the other funds. It has not been a tidal wave by any stretch but again, we are in the -- still early in this process. As you know, we brought Jeff Lane in to become the CEO of the asset management division. Certainly one of our key efforts there is to restore our

investor's confidence in our business and our product and capabilities and we're in the process of doing that.

46.     On November 14, 2007, Bear Stearns announced a write-down of approximately $1.2 billion of mortgage-backed debt instruments held on its balance sheet.

47.     On December 19, 2007, Barclays plc sued Bear Stearns for fraud and deception over the loss of $400 million dollars in the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund.  Barclays accused Bear Stearns of loading one of its hedge funds with about $500 million in troubled assets just weeks before it and another Bear Stearns fund collapsed.  Barclays described the fund's demise as "one of the most high profile and shocking hedge fund failures in the last decade". The suit alleges that up to the last days before the bail-out, Bear Stearns executives engaged in a cover-up to hide the slump in its value.

48.     The media has also reported that one of Bear Stearns' fund managers was under investigation for moving $2 million of his own money out of one of the two troubled funds in February 2007, just a few months before they collapsed.

49.     On January 8, 2008, the media reported that Bear Stearns officials were expected to meet in the middle of January with U.S. prosecutors to discuss the failure of two of its hedge funds.

50.     On January 8, 2008, Bear Stearns announced that James Cayne informed the Board of Directors that he would step down as chief executive officer, effective immediately. The Company also announced that Mr. Cayne would retire from Bear Stearns, but would stay on as chairman of the Board of Directors and would be succeeded as chief executive officer by Bear Stearns president Alan D. Schwartz.

51.    On March 10, 2008, the media reported insolvency rumors and concerns about liquidity at Bear Stearns, which were met with a quick denial by the Company. Mr. Schwartz in a statement said that "…there is absolutely no truth to the rumors of liquidity problems," noting that the Company's "…balance sheet, liquidity, and capital remain strong." During a CNBC interview, former Bear Stearns' CEO and current board member Alan Greenberg false and misleadingly characterized the rumors regarding the Company's liquidity issues as "totally ridiculous." The Company's shares closed down $7.78, or 11.1% to $62.30 a share on high volume.

52.    On March 11, 2008, during an interview with CNBC, Defendant Molinaro false and misleadingly asserted that rumors of Bear Stearns facing a liquidity crunch are false. He continued, "Why is this happening? I don't know how to characterize it. If I knew why it was happening I would do something to address it. I've spent the day trying to track down the source of the rumors, but they are false. There is no liquidity crisis. No margin calls. It's all nonsense."

53.    On March 14, 2008, Bear Stearns could no longer hide its problems, as the Federal Reserve Bank of New York and JPMorgan Chase & Co. ("JPMorgan Chase") announced plans to provide a secured loan facility to Bear Stearns. As reported that day by the *Associated Press*, the Federal Reserve invoked a rarely used Depression-era procedure to bolster troubled Bear Stearns. According to the article, "Senior Federal Reserve staffers said the arrangement allows JP Morgan Chase to borrow from the [Federal Reserve's] discount window and put up collateral from Bear Stearns to back up the loans. JP Morgan, a bank, has access to the discount window to obtain direct loans from the Fed, but Bear Stearns, an investment house, does not.

While JP Morgan is serving as a conduit for the loans, the Federal Reserve and not JP Morgan will bear the risk if the loans are not repaid, officials said."

54.     Immediately after the bail-out plan was announced, on March 14, the Company hosted a conference call during which CFO Samuel Molinaro and President and CEO Alan Schwartz discussed liquidity concerns and the rationale for the secured loan facility capital with JPMorgan Chase.  Mr. Molinaro spoke first noting that the release of results for the fiscal first quarter (ending February 29) had been moved up to Monday, March 17, from Thursday March 20, to discuss results sooner.  He then handed the call over to Mr. Schwartz who began his comments by saying that "Bear Stearns has been subject to a significant amount of rumor and innuendo over the past week.  We attempted to try to provide some facts to the situation, but in the market environment we're in, the rumors have intensified.  And given the nervousness in the market, a lot of people it seemed wanted to act to protect themselves from the possibility of the rumors being true and could wait later to see the facts."  He went to note that "...although our capital ratios remain in good shape, our liquidity situation deteriorated...," and while the firm continued to have very strong liquidity, "...the concerns on the part of counterparties, on the part of our customers, and lenders got to the point where a lot of people wanted to get cash out."  He said that while the Company was addressing and meeting those needs "in every case," it reached a point where "...they accelerated yesterday, and as we got through the day...we recognized...there could be continued liquidity demands that would outstrip our liquidity resources."

55.     On March 14, 2008, the Company's shares closed down $27.00, **or 47.4% to $30.00 a share on volume of 187,000,000 shares**, or roughly 25.8 time the average daily volume.

56.     On March 17, 2008, Bear Stearns shocked the market again after it was announced that it agreed to be acquired by JP Morgan Chase for **just $2 per share**. On this news the Company's share price fell to a close of $4.81, **an 84% drop** from the previous trading day's close.

57.     In all, as Bear Stearns slowly revealed its dire financial conditions, its stock fell from $156.03, on December 14, 2006, to $4.81, at the close of the market on March 17, 2008. This amounts to a 97% decline in share price and a loss of approximately $21.1 billion in market value in a little over a year.

## VIII.    DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

### A.    Defendants' Knowledge of Bear Stearns's Stock Risk and Subsequent Communication with Plan Participants and Beneficiaries

58.     Because of Defendants' positions with the Company, they had access to adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plan, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided them in connection therewith.

Doc. 160173                                    -19-

59.    Because of their access to this information, the Defendants knew or should have known that Bear Stearns's common stock was an imprudent investment during the Class Period.

60.    Upon information and belief, the Defendants regularly communicated with employees, including Plan participants and beneficiaries, about Bear Stearns's financial performance, future financial and business prospects, and the attractiveness of Bear Stearns stock.

61.    Despite the Defendants' knowledge of Bear Stearns's risky business practices during the Class Period, the Company fostered a positive attitude toward Bear Stearns stock as a Plan investment.  Management touted strong Company performance and stock benefits. Employees continually heard positive news about Bear Stearns's growth, were led to believe that Bear Stearns stock was a good investment, and that the Plans were prudently managed.

62.    Moreover, Bear Stearns publicly repeatedly highlighted favorable operating results, artificially favorable revenue growth trends, and other positive financial indicators, which were later found to be false and misleading.

63.    As fiduciaries, the Defendants had a duty to provide participants with complete and accurate information regarding the Plans' investment in Bear Stearns common stock. Despite these duties, however, the Defendants failed to provide Plan participants with complete and accurate information regarding Bear Stearns stock, such that the participants could appreciate the true risks presented by investments in the stock and could make informed decisions regarding their investments.

64.    Employees never received any information from the Company or any other Plan fiduciary that indicated that the Company's stock was not a prudent investment for their funds remaining in the Plans.

65.    Bear Stearns employees and Plan participants were led to believe that Bear Stearns stock was a prudent investment and that the Plans were managed properly.   These misleading communications regarding the performance of Bear Stearns stock and its true value caused Plaintiff and the Class to invest in Bear Stearns common stock and to maintain that investment to their detriment.

66.    Even though the Defendants knew or should have known these facts, and even though they knew of the high concentration of Plan participant funds invested in Bear Stearns common stock, they did nothing to address these risks and circumstances.

67.    Defendants' concealment of material non-public information, as well as their improper influence on Plan participants, caused Plaintiff and the Class to invest in Bear Stearns stock and retain their investment in the stock.  The  investment decisions of the Plaintiff and the Class were dependent on the misrepresentations and omissions of the Defendants.

**B.    Conflicts of Interest**

68.    The Individual Defendants had a strong incentive for the participants of the Plan to invest heavily in Bear Stearns stock because their compensation was closely tied to the performance of Bear Stearns's stock price.  Further, the Individual Defendants' breaches of fiduciary duties enabled them to benefit from the sale of hundreds of thousands of shares from their own personal holdings of Bear Stearns stock, generated tens of millions of dollars for themselves.

Doc. 160173                                         -21-

69.    In addition, the Individual Defendants and the employees of Custodial Trust Company are dominated and/or controlled by Bear Stearns. Their salaries and bonuses were dependent upon obedience to Bear Stearns.

70.    These conflicts of interest forced the Defendants to choose between serving their own interests or serving the interests of the Plan participants and beneficiaries. Although ERISA requires that the Defendants serve the participants and beneficiaries with loyalty and prudence, the Defendants failed to do so.

### C.    Causation

71.    The Plan suffered hundreds of millions of dollars because a substantial amount of the Plan's assets were imprudently allowed to be put at great risk by the Defendants, through investment by the Plan in Bear Stearns common stock during the Class Period, and in breach of Defendants' fiduciary duties.

72.    Had the Defendants properly discharged their fiduciary duties and divested the Plan of Company stock when such investment became imprudent, the Plan would have avoided all of the losses that it suffered through its investment in Company common stock.

### D.    Remedies for Defendants' Breach of Fiduciary Duties

73.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in Company stock. As a consequence of the Defendants' breaches, the Plan suffered significant losses.

74.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires

"any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

75.     Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above, in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2)-(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

76.     Each Defendant is personally liable and jointly liable for the acts of the other Defendants as a co-fiduciary.

## IX.    CLASS ACTION ALLEGATIONS

77.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of herself and a class consisting of all participants or beneficiaries of the Plan and their beneficiaries, excluding the Defendants, for whose accounts the fiduciaries of the Plan made or maintained investments in Bear Stearns stock through the Plan during the Class Period, from December 14, 2006 through the present. Excluded from the Class are Defendants, members of the Defendants' immediate families, any

officer, director or partner of any Defendant or any entity in which a Defendant has a controlling

interest and the heirs, successors or assigns of any of the foregoing.

     78.    This action is properly maintainable as a class action because:

     A.    The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members are unknown by Plaintiff at this time

and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a

minimum, thousands of members of the Class. According to the Plan's Form 5500 Annual

Report for the year ended December 31, 2005, the plan had 8,986 participants with account

balances at the end of the year.

     B.    Plaintiff's claims are typical of those of the Class because Plaintiff and

members of the Class suffered similar harm and damages as a result of Defendants' systematic

unlawful and wrongful conduct described herein. Absent a class action, members of the Class

may not receive restitution or other appropriate relief, will continue to suffer losses, and these

violations of law will proceed without remedy.

     C.    Plaintiff is a representative party who will fairly and adequately protect the

interests of the other members of the Class and has retained counsel competent and experienced

in complex class action and ERISA litigation. Plaintiff has no interests antagonistic to, or in

conflict with, the Class it seeks to represent.

     D.    A class action is superior to other available methods for the fair and

efficient adjudication of the claims asserted herein. Prosecution of separate actions by members

of the Class would create a risk of inconsistent adjudications with respect to individual members

of the Class which would establish incompatible standards of conduct for Defendants. As the

-24-

damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote. Furthermore, Defendants' conduct affected and affects all Class members in a similar manner making declaratory and injunctive relief to the Class as a whole appropriate.

79.     The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class. The questions of law and fact which are common to Plaintiff and the Class include, among others:

     a.    Whether ERISA applies to the claims at issue;

     b.    Whether Defendants owe and owed fiduciary duties to the members of the Class;

     c.    The nature of the fiduciary duties Defendants owe or owed to members of the Class;

     d.    Whether Defendants breached their fiduciary duties; and

     e.    The extent of losses sustained by members of the Class and/or the Plan and the appropriate measure of relief.

80.     Plaintiff anticipates no difficulties in the management of this action as a class action.

## X.    CLAIMS FOR RELIEF

### COUNT I
### For Breach of Fiduciary Duty or Knowing Participation Therein

81.    Plaintiff incorporates the foregoing paragraphs herein by reference.

82.    The Plan is governed by the provisions of ERISA, 29 U.S.C. § 1001, *et seq.*, and Plaintiff and the Class are participants and/or beneficiaries in the Plan. Each of the Defendants is a fiduciary or co-fiduciary with respect to the Plan pursuant to the provisions of ERISA. As co-fiduciaries, each of the Defendants is liable for the other's conduct.

83.    Defendants violated their fiduciary duties of loyalty and prudence by: (1) failing to adequately investigate and monitor the merits of the investments in Company stock; (2) failing to take steps to eliminate or reduce the amount of Company stock in the Plan; and (3) failing to give Plaintiff and the Class accurate information about Bear Stearns regarding its business practices so they could make informed investment decisions.

84.    At all times relevant to the allegations raised herein, each of the Defendants was a co-fiduciary of the others. Each Defendant knowingly participated in the fiduciary breaches described herein, enabled its co-fiduciaries to commit such fiduciary breaches by its own failure to comply with the provisions of ERISA, and/or had knowledge of the breaches of its co-fiduciaries and failed to take reasonable efforts to remedy such breaches.

85.    As a result of Defendants' breach of fiduciary duties, Plaintiff and the Class, as well as the Plan, suffered damages, the exact amount of which will be determined at trial. Defendants are personally liable to Plaintiff, the Class, and the Plan, for these losses.

## COUNT II
### For Violations of ERISA Disclosure Requirements

86.    Plaintiff incorporates the foregoing paragraphs herein by reference.

87.    Defendants failed to advise Plaintiff and the Class that their investment in Bear Stearns stock was at substantial risk as a result of the Company's business practices and its exposure to massive penalties and/or fines.  Defendants also failed to provide Plaintiff and the Class with accurate, truthful, or complete information about the Company's operations and extremely risk-fraught generation of revenue.

88.    Unbeknownst to Plaintiff and the Class, but known to Defendants, Bear Stearns's undisclosed risk of impaired financial condition was not revealed during the relevant time period. Because of the disparity in knowledge between Defendants, Plaintiff, and the Class, Plaintiff and the Class relied on Defendants to provide them with accurate and complete information about Bear Stearns, which was material to the suitability of Company stock as a prudent investment.

89.    By failing to convey complete and accurate information to Plaintiff and the Class, Defendants violated their affirmative duty to disclose sufficient information to apprise Plaintiff and the Class of the risks associated with investment in Company stock when Defendants knew or should have known that the failure to disclose such material information would result in damages to Plaintiff and the Class.

90.    As a result of Defendants' failure to disclose and inform, Plaintiff and the Class suffered damages, the exact amount of which will be determined at trial.  Defendants are personally liable to Plaintiff and the Class for these losses.

## COUNT III
### For Failure to Monitor Fiduciaries

91.     Plaintiff incorporates the foregoing paragraphs herein by reference.

92.     At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

93.     Upon information and belief, at all relevant times, the scope of the fiduciary duties of Defendants included the responsibility to appoint, and, thus, monitor the performance of the appointed fiduciaries.

94.     Under ERISA, a monitoring fiduciary must ensure that the appointed fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

95.     The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

96.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

97.    Defendants breached their fiduciary monitoring duties by, among other things: (a) failing altogether to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent action; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of Bear Stearns's highly risky and inappropriate business, and the likely impact of such practices on the value of the Plan's investment in Bear Stearns stock; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed decisions with respect to the Plan's assets; and (d) failing to remove appointees named herein whose performance was inadequate in that they continued to make and maintain huge investments in Bear Stearns stock during the Class Period for participants' retirement savings in the Plan, and who breached their fiduciary duties under ERISA.

98.    As a result of Defendants failure to monitor fiduciaries, Plaintiff and the Class suffered damages, the exact amount of which will be determined at trial.  The Individual Defendants are personally liable to Plaintiff, the Class, and the Plan, for these losses.

## COUNT IV
### For Breach of Duty to Avoid Conflicts of Interest

99.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

100.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

101.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

102.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, inter alia: failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in Bear Stearns common stock; failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transactions which made Bear Stearns stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company, their co-defendants, and themselves above the interests of the participants with respect to the Plan's investment in Company stock.

103.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

104.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V
### Co-Fiduciary Liability

105.    Plaintiff incorporates by this reference the allegations set forth above.

106.    As alleged above, during the Class Period the Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

107.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he/she may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he/she knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Defendants breached all three provisions.

108.    **Knowledge of a Breach and Failure to Remedy:** ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary, if he/she has knowledge of a breach by such other fiduciary, unless he/she makes reasonable efforts under the circumstances to remedy the breach.  Defendants knew of the breaches by other

fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. In particular, they did not communicate their knowledge of the Company's illegal activity to the other fiduciaries.

109.    Bear Stearns, through its officers and employees, engaged in highly risky and inappropriate business practices, withheld material information from Plan participants and the market, provided Plan participants and the market with misleading disclosures, and profited from such practices, and, thus, knowledge of such practices is imputed to Bear Stearns as a matter of law.

110.    The Individual Defendants, by virtue of their positions at Bear Stearns, participated in and/or knew about the Company's highly risky and inappropriate business and as well as their consequences, including the artificial inflation of the value of Bear Stearns stock.

111.    Because the Defendants knew of the Company's inappropriate business practices, they also knew that other fiduciaries were breaching their duties by continuing to invest in Company stock and providing incomplete and inaccurate information to participants. Yet, they failed to undertake any effort to remedy these breaches. Instead, they compounded them by downplaying the significance of Bear Stearns's loan loss exposures, and obfuscating the risks posed to the Company, and, thus, to the Plan.

112.    **Knowing Participation in a Breach**: ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Bear Stearns, as a de facto and named fiduciary as alleged above, participated in all aspects of the fiduciary

breaches of the other Defendants.  Likewise, the Individual Defendants knowingly participated in the breaches of other fiduciaries because, as alleged above, they had actual knowledge of the Company's misconduct, ignoring their oversight responsibilities, and permitted Plan fiduciaries to breach their duties.

113.    **Enabling a Breach**: ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his/her specific responsibilities which give rise to his/her status as a fiduciary, he/she has enabled another fiduciary to commit a breach.

114.    The Defendants' failure to monitor the appointed Plan fiduciaries enabled those fiduciaries to breach their duties.

115.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost hundreds of millions of dollars of retirement savings.

116.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**COUNT VI**
**Knowing Participation in a Breach of Fiduciary Duty**
**(against Bear Stearns)**

117.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

118.    To the extent that Bear Stearns is found not to have been a fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, Bear Stearns knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

119.    Bear Stearns benefitted from the breaches by discharging its obligations to make contributions to the Plan in amounts specified by the Plan, contributing Bear Stearns stock to the Plan while the value of the stock was inflated as the result of Bear Stearns's highly risky and improper business practices, and providing the market with materially misleading statements and omissions.  Accordingly, Bear Stearns may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of Bear Stearns stock which would have been contributed to the Plan, but for Bear Stearns's participation in the foregoing breaches of fiduciary duty.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a.    Determining that this is a proper class action to be certified under Rule 23 and appointing Plaintiff class representative on behalf of the Class;

b.    Declaring that Defendants have violated the duties, responsibilities, and obligations  imposed upon them as fiduciaries and co-fiduciaries and that they violated the ERISA disclosure and monitoring requirements as described above;

c.    Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder, pursuant to Fed. R. Civ. P. 64 and 65;

d.    Awarding the Plans and/or Plaintiff and members of the Class, restitution, disgorgement and/or other remedial relief;

e.    Allowing a trial by jury to the extent permitted by law;

f.    Awarding the Plans and/or Plaintiff and members of the Class pre-judgment and post judgment interest, as well as their reasonable attorneys' fees, expert witness fees, and other costs; and

g.    Awarding such other relief as this Court may deem just and proper.

Dated: New York, New York

March 18, 2008

Respectfully submitted,

By: _____
Marian P. Rosner (MR-0410)
Andrew Lencyk (AL-4329)
James Kelly-Kowlowitz (JK-9616)
WOLF POPPER LLP
845 Third Avenue
New York, New York 10022
Tel. (212) 759.4600

*Attorneys for Plaintiff*